[Cite as *State v. Alexander*, 2019-Ohio-3310.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | |

| STATE OF OHIO | C.A. No. 18CA0066-M |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JENNIFER L. ALEXANDER | COURT OF COMMON PLEAS COUNTY OF MEDINA, OHIO |
| Appellant | CASE No. 18CR0080 |

DECISION AND JOURNAL ENTRY

Dated: August 19, 2019

CARR, Presiding Judge.

{¶1}   Defendant-Appellant, Jennifer Alexander, appeals from the judgment of the Medina County Court of Common Pleas, denying her motion to suppress.  This Court affirms.

I.

{¶2}   At approximately 1:30 a.m., Officer James Allenby responded to a nearby gas station based on a tip that two males appeared to be either under the influence of narcotics or involved in drug activity.  The informant indicated that the two males were leaving the gas station in a blue Dodge four-door vehicle, and Officer Allenby spotted a matching vehicle as he approached the parking lot.  Because the vehicle was leaving the lot, Officer Allenby followed behind it and executed a traffic stop shortly thereafter.

{¶3}   The vehicle contained three occupants: (1) Alexander, who was the driver, (2) her boyfriend, who was the front seat passenger; and (3) an acquaintance, who was the backseat passenger.  Officer Allenby spoke with each occupant in turn and continued to investigate, as he

found their circumstances suspicious and it was clear to him that the backseat passenger was under the influence of narcotics. Approximately 38 minutes into the traffic stop, he and another officer spotted an item of concern in the back of Alexander's vehicle and asked her for consent to retrieve the item and open it. Alexander assented, so they removed the item and identified it as a scale coated with drug residue. After locating that item, they searched the remainder of the vehicle and discovered narcotics. A second search of the vehicle, conducted several days later, also revealed narcotics that had been concealed inside a pillow in the trunk.

{¶4} A grand jury indicted Alexander on three counts of aggravated possession and one count of aggravated trafficking in methamphetamine. Alexander filed a motion to suppress, and a hearing was held on her motion. Following the hearing, the court denied the motion, and the parties reached a plea agreement. Consistent with their agreement, the State dismissed one count of aggravated possession, and Alexander pleaded no contest to the three remaining counts. The court then merged one aggravated possession count with the aggravated trafficking count and sentenced Alexander to two years in prison on her two remaining counts.

{¶5} Alexander now appeals from the trial court's denial of her motion to suppress and raises one assignment of error for our review.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT DENIED THE DEFENDANT HER CONSTITUTIONAL RIGHTS AGAINST ILLEGAL SEARCH AND SEIZURE BASED UPON HER MOTION TO SUPPRESS THE EVIDENCE IN THIS CASE.

{¶6} In her sole assignment of error, Alexander argues that the trial court erred when it denied her motion to suppress. Specifically, she argues that officers lacked reasonable suspicion

to stop her vehicle and violated her rights when they detained her for an unreasonable length of time. We do not agree.

{¶7} A motion to suppress evidence presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. "When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.*, citing *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Thus, a reviewing court "must accept the trial court's findings of fact if they are supported by competent, credible evidence." *Burnside* at ¶ 8. "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, citing *State v. McNamara*, 124 Ohio App.3d 706, 710 (4th Dist.1997).

{¶8} To justify an investigative stop, an officer must point to "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Maumee v. Weisner*, 87 Ohio St.3d 295, 299 (1999), quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968). "[W]here an officer making an investigative stop relies solely upon a dispatch, the [S]tate must demonstrate at a suppression hearing that the facts precipitating the dispatch justified a reasonable suspicion of criminal activity." (Emphasis omitted.) *Maumee* at 298.

> When, in turn, the dispatch is based on information provided by an informant's tip, "the determination of reasonable suspicion will be limited to an examination of the weight and reliability due that tip. The appropriate analysis, then, is whether the tip itself has sufficient indicia of reliability to justify the investigative stop." *Id.* at 299. Relevant factors in this determination include "the informant's veracity, reliability, and basis of knowledge." *Id.*, citing [*Alabama v. White*, 496 U.S. 325, 330 (1990)].

*State v. Dellagnese*, 9th Dist. Summit No. 27492, 2015-Ohio-4349, ¶ 7. "Typically, a personal observation by an informant is due greater reliability than a secondhand description." *Maumee*

at 302. Likewise, "[t]he immediacy of [a] report lends further credibility to [a] tip, as the informant's account is not completely dependent on memory." *State v. Borum*, 9th Dist. Summit No. 27167, 2014-Ohio-5639, ¶ 8, citing *Maumee* at 302.

{¶9} Once an officer executes an investigative stop, it generally "may last no longer than necessary to accomplish the initial goal of the stop." *State v. Rackow*, 9th Dist. Wayne No. 06CA0066, 2008-Ohio-507, ¶ 8. *Accord Rodriguez v. United States*, 575 U.S. ___, 135 S.Ct. 1609, 1614 (2015). If, however, during the investigatory stop "the officer discovers additional facts from which it is reasonable to infer additional criminal activity[,] the officer is permitted to lengthen the duration of the stop to investigate such suspicions." *State v. Williams*, 9th Dist. Lorain No. 09CA009679, 2010-Ohio-3667, ¶ 15. *Accord State v. Robinette*, 80 Ohio St.3d 234, 241 (1997). The question is whether, under the totality of the circumstances, the officer possessed reasonable suspicion to extend the detention. *See State v. Ross*, 9th Dist. Lorain No. 12CA010196, 2012-Ohio-6111, ¶ 8. "'[R]easonable suspicion exists if an officer can point to specific and articulable facts indicating that [an individual] may be committing a criminal act.'" *State v. Osburn*, 9th Dist. Wayne No. 07CA0054, 2008-Ohio-3051, ¶ 9, quoting *Wadsworth v. Engler*, 9th Dist. Medina No. 2844-M, 1999 WL 1215151, *3 (Dec. 15, 1999).

{¶10} The trial court found that, at about 1:30 a.m., Officer James Allenby received a dispatch regarding suspicious individuals at a nearby gas station. The dispatcher received his or her information from the gas station clerk, who reported that the suspicious individuals had been "involved in drug activity" in the restroom and were leaving in a blue four door vehicle. The court found that Officer Allenby knew the gas station clerk who had called, dealt with her on a daily basis, and felt that she was a reliable source given that the employees of the 24-hour gas station were "used to people doing drugs in their bathroom." Only after he completed the stop

did Officer Allenby learn that the clerk had not personally observed the suspicious activity she relayed to the dispatcher. Instead, a customer had reported the suspicious activity to her, and she, in turn, had reported it to the dispatcher.

{¶11} The trial court found that, as Officer Allenby approached the gas station in his cruiser, he saw a blue four door vehicle. Noting that it matched the vehicle description he had received from dispatch and that it had a burned-out license plate light, Officer Allenby stopped the vehicle to investigate. Upon his approach, he discovered that the vehicle had three occupants. Alexander was the driver, her boyfriend was the front seat passenger, and an acquaintance of theirs was the backseat passenger. Officer Allenby began his investigation by collecting their information and identifying each person. As he was doing so, he noticed the backseat passenger had "heavy or droopy eyelids" indicative of drug use. The court found that Officer Allenby had undergone Drug Recognition Training and was "able to recognize the physical signs of when a person is under the influence of seven different types of drugs including amphetamines." Consequently, the court found him to be a Drug Recognition Expert, qualified to determine that the backseat passenger was under the influence of narcotics.

{¶12} The trial court found that Officer Allenby spoke with each of the vehicle's three occupants in turn, separating them one at a time by making use of his cruiser and the cruiser of a second officer who had arrived to assist. While speaking with Alexander, Officer Allenby learned that she and her boyfriend were from an area near Sandusky. Alexander told the officer that she and her boyfriend had driven to Akron to pick up the backseat passenger because he was drunk and had called for a ride. Officer Allenby found it strange that Alexander and her boyfriend would drive that far in the middle of the night just to give the backseat passenger a ride. He then informed Alexander that someone at the gas station had seen two men engaged in

suspicious activity in the bathroom, and she confirmed that her boyfriend and the backseat passenger had gone into the bathroom. Following his initial conversation with Alexander, Officer Allenby spoke with the backseat passenger.

{¶13} The trial court found that, as Officer Allenby spoke with the backseat passenger, he confirmed his initial suspicion that the man was under the influence of narcotics. The officer observed that the backseat passenger's pupils were constricted in spite of the dark surroundings, his speech was slurred, and his eyelids continued to be droopy. The backseat passenger admitted that he had been in the gas station bathroom and had used drugs in the past, but denied any recent use. As Officer Allenby continued to speak with him, however, he began crying and admitted that he had used heroin earlier that day. The backseat passenger acknowledged that Alexander and her boyfriend had picked him up in Akron, but did not say how he knew them.

{¶14} The trial court found that, after speaking with the backseat passenger, Officer Allenby spoke with the boyfriend. Much like Alexander, the boyfriend initially maintained that the backseat passenger was drunk. After Officer Allenby informed him that the backseat passenger was actually under the influence of heroin, however, the boyfriend then offered that he had only known the backseat passenger for a few days. That statement also aroused Officer Allenby's suspicions given the considerable distance that Alexander and her boyfriend had driven in the middle of the night to pick up the backseat passenger. Moreover, while speaking with the boyfriend, the officers noticed track marks on his neck. When Officer Allenby asked about the track marks, the boyfriend admitted that he sometimes injected drugs, but claimed he had not done so for several days. He indicated that he took prescription Percocet each day for pain and would use heroin when his pills ran out.

{¶15} The trial court found that, following his conversations with each of the three occupants, Officer Allenby and his fellow officer walked around Alexander's vehicle and looked through the windows. They noticed a black object in the backseat, and the second officer relayed that she had seen Alexander's boyfriend attempt to throw a blanket over the object while still inside the car. Officer Allenby asked Alexander about the object, but she claimed not to know what it was. He then asked her for permission to remove the object and open it, and she agreed he could do so. Upon opening the object, Officer Allenby discovered it was a scale coated with crystals that resembled methamphetamine residue.

{¶16} The trial court concluded that Officer Allenby possessed reasonable suspicion to stop Alexander's vehicle based on the information he received from dispatch. It found that the tip the dispatcher received from the gas station clerk and relayed to Officer Allenby possessed sufficient indicia of reliability because the officer was very familiar with the clerk and knew her to be a reliable source. Though it was actually a customer who had observed the suspicious activity and not the clerk herself, the court noted that Officer Allenby was unaware of that fact until later. Based on the information available to him at the time of the stop, the court concluded that Officer Allenby had reasonable suspicion to conduct an investigatory stop to determine whether Alexander or her passengers "were in possession of illegal drugs and paraphernalia to use or sell * * *."

{¶17} The trial court also concluded that, once Officer Allenby began his investigation, he continued to develop "more 'specific and articulable facts' [to] support[] his initial suspicions that the occupants were involved in drug activity." Those facts included the backseat passenger's appearance and behavior, Alexander and her boyfriend's claim that the backseat passenger was only intoxicated, their further claim that they had driven a considerable distance

to pick up someone they barely knew at such a late hour, the track marks on the boyfriend's neck, and the backseat passenger and boyfriend's admissions that they were heroin users. The court found that Officer Allenby was justified in continuing to detain Alexander until he spotted the black case in her car and, as a result of opening it, developed probable cause to search the remainder of her car.

{¶18} Alexander argues that Officer Allenby lacked reasonable suspicion to stop her vehicle. According to Alexander, the State failed to prove that the tip the officer received from dispatch possessed sufficient indicia of reliability. She asserts that it is unclear from the record what information the dispatcher actually had, as the State failed to present the gas station clerk's 911 call, her testimony, or the testimony of the customer who allegedly witnessed and reported the suspicious activity. Because the customer was never identified, Alexander asserts that the information came from an anonymous, and therefore inherently unreliable, source. She argues that Officer Allenby made no attempt to investigate the tip or otherwise corroborate its reliability before acting on it. Therefore, she argues that he lacked reasonable suspicion to conduct his investigation.

{¶19} Alexander's argument sounds entirely in law, as she has not challenged any of the trial court's factual findings. Upon review, the court's factual findings comport with Officer Allenby's testimony, as well as the remaining evidence introduced at the suppression hearing. As such, we must conclude that the court's factual findings are supported by competent, credible evidence. *See Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8. Because the record contains competent, credible evidence in support of the trial court's findings and Alexander has not challenged them on appeal, we accept those facts as true and independently determine "whether the facts satisfy the applicable legal standard." *See id.*

{¶20} Having reviewed the record, we cannot conclude that the trial court erred when it determined that the tip Officer Allenby received from dispatch provided him with reasonable suspicion to stop Alexander's car and investigate its occupants for possible drug activity. The tip possessed sufficient indicia of reliability for several reasons. *See Dellagnese*, 2015-Ohio-4349, at ¶ 7, quoting *Maumee*, 87 Ohio St.3d at 299. First, the gas station clerk who placed the call to dispatch was well known to officers, had daily interactions with Officer Allenby, and had provided the police with reliable information in the past. Second, Officer Allenby was aware that the 24-hour gas station had a reputation for drug activity during the late hours such that its employees were "used to people doing drugs in their bathroom." *See State v. Hairston*, 156 Ohio St.3d 363, 2019-Ohio-1622, ¶ 12 ("An officer's experience with criminal activity in an area and an area's reputation for criminal activity are factors we have found relevant to the reasonable-suspicion analysis."). Third, the tip was extremely timely. *See Borum*, 2014-Ohio-5639, at ¶ 8, citing *Maumee* at 302 ("The immediacy of [a] report lends further credibility to [a] tip * * *."). Officer Allenby testified that he was "right around the corner" when he received the tip and, upon his arrival at the gas station, he was immediately able to confirm that a vehicle matching the vehicle description he had received was preparing to leave the parking lot. All of the foregoing factors, coupled with Officer Allenby's observation of the vehicle's burnt-out license plate light, gave rise to reasonable suspicion to justify the investigatory stop that he conducted. *See Maumee* at 299, quoting *Terry*, 392 U.S. at 21. *See also Dayton v. Erickson*, 76 Ohio St.3d 3, 11-12 (1996) (minor traffic violations may give rise to reasonable suspicion and/or probable cause to justify a traffic stop). Accordingly, the trial court did not err when it concluded that Officer Allenby conducted a constitutionally valid stop. We reject Alexander's argument to the contrary.

{¶21} Next, Alexander argues that Officer Allenby unnecessarily prolonged the traffic stop and exceeded the scope of its original purpose in the absence of reasonable suspicion. She argues that the gas station clerk's tip did not pertain to a female and Officer Allenby never claimed that she, as the driver of the car, appeared to be under the influence of alcohol or narcotics. According to Alexander, once Officer Allenby verified their identities and failed to obtain her consent to search her vehicle, he was obligated to terminate his investigation. Because he failed to do so, Alexander argues that the trial court erred by denying her motion to suppress.

{¶22} Upon review, we must conclude that the record contains competent, credible evidence in support of the trial court's determination that Officer Allenby legally detained Alexander for the duration of the traffic stop. Approximately 38 minutes elapsed between the point in time that Officer Allenby executed the stop and the point in time that he discovered the residue-coated scale inside the vehicle. During that period of time, Officer Allenby was actively confirming the identities of the three occupants, speaking separately with each occupant, conferring with the second officer on scene, inspecting Alexander's vehicle, and performing other tasks in the pursuit of his investigation. The record does not support the conclusion that he purposely delayed matters or otherwise failed to diligently conduct his investigation. *See Ross* at ¶ 8, quoting *State v. Davenport*, 9th Dist. Lorain No. 11CA010136, 2012-Ohio-4427, ¶ 6.

{¶23} The trial court determined that, as the stop progressed, Officer Allenby continued to develop "more 'specific and articulable facts' [to] support[] his initial suspicions that the occupants were involved in drug activity." The record supports that determination given the backseat passenger's appearance and behavior, Alexander and her boyfriend's claim that he was only intoxicated, their further claim that they had driven a considerable distance to pick up

someone they barely knew at such a late hour, the track marks on the boyfriend's neck, and the backseat passenger and boyfriend's admissions that they were heroin users. Based upon the totality of the circumstances, Officer Allenby possessed reasonable suspicion to extend Alexander's detention as he continued to investigate the suspicious activity that he observed. *See Ross* at ¶ 8. We, therefore, reject Alexander's argument to the contrary.

{¶24} Upon review, we cannot conclude that the trial court erred by denying Alexander's motion to suppress. Thus, her sole assignment of error is overruled.

### III.

{¶25} Alexander's sole assignment of error is overruled. The judgment of the Medina County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

HENSAL, J.
SCHAFER, J.
CONCUR.

APPEARANCES:

WESLEY A. JOHNSTON, Attorney at Law, for Appellant.

S. FORREST THOMPSON, Prosecuting Attorney, and VINCENT V. VIGLUICCI, Assistant Prosecuting Attorney, for Appellee.